## EASTMAN *v.* MARTIN.

Where a witness stated that he derived his knowledge of the relationship of certain parties from a genealogical table, but the table was not produced, and there was no evidence that it had been publicly recognized as authentic by the family, or that it had been prepared by a member of the family, *held*, that the statement by the witness of the contents of the table was merely hearsay evidence and inadmissible.

Where the witness said that he derived his information partly from having examined a certain tombstone, but he did not state what was the inscription, nor was any copy of the inscription produced, nor did it appear how much of his information was derived from the tombstone, *held*, that his testimony was incompetent.

Where a witness was a *consanguineous* of the family, and stated certain descents therein, of which he had no personal knowledge, and it did not appear that it was reputed in the family that such were the descents, *held*, that his testimony was incompetent.

The witness said that there was a conveyance between certain parties, "according to my impression, having heard them conversing thereon." *Held*, that this evidence was incompetent to prove the transfer of real estate.

To prove the authority of a person as an attorney to convey real estate, a witness stated that "my impression is, according to the best of my recollection, my said father was appointed attorney for his sister Mary and for Thomas," and that he had looked among his father's papers, and could not find the power of attorney. But it appeared that he never saw such an instrument, nor ever heard the parties admit that there was one, and that he had not searched the Registry of Deeds, where it probably would be recorded. *Held*, that the evidence was incompetent to prove the authority of the person to act as attorney for this purpose.

TRESPASS *quare clausum.* There was a new assignment, setting forth the close in which, &c., and the plea of the general issue, with a brief statement of various matters of defence.

The plaintiff gave in evidence a deed of the close, in which, &c. from Daniel Blaisdell to himself, dated November 24th, 1832, acknowledged on the same day, and recorded June 20th, 1843. It was a warrantee deed of a close, with the same boundaries described in the new assignment, and describing the close as "*undivided lands*," and as "mean-

ing to convey all the undivided lands in Canaan within the above described boundaries." He then offered evidence tending to show that after the date of the deed he entered upon the land, drew timber from it, cleared ten or fifteen acres in all, built a barn upon it, and sold off the pine timber.

The tract contains above five hundred acres. There was also evidence tending to show that in 1821, 1822, and 1823, one A. Kimball entered upon the tract of land and cut timber, by direction of Blaisdell. It appeared that within the time described in the plaintiff's declaration, the defendant had entered upon what he claimed as his pitch, being ten acres of the close, and cut pine timber there, that he cut roads to the pitch and drew timber from it across other parts of the close described in the new assignment; but all the acts of trespass proved were such as resulted from cutting and drawing off the pine timber on the pitch, and making roads to the same.

The defendant then showed that Richard Wibird was one of the original grantees of Canaan, and he claimed the right of Wibird in the lands in Canaan, which were undivided, January 4th, 1836, and a right to make the ten acre pitch under Wibird's right.

For this purpose the defendant produced a deed from John Martin, of ten acres of land in Canaan, to be located any where out of the land that Ira Eastman conveyed to Caleb C. Bartlett and John L. Pressey; also Bartlett's deed to John Martin, of ten acres of land in Canaan, to be located any where out of the land that Eastman conveyed to him and John L. Pressey; also Eastman's deed to Bartlett and Pressey, of all his interest in the lands conveyed to him in Canaan by Daniel Pattee, jr. and James Pattee; also Pattee's deed to Eastman, of all the rights to all the lands they bought of the Penhallow heirs by deeds dated January 4th, 1836, as conveyed to them by Benjamin Penhallow, Susan Penhallow, Mary Austin, by her attorney Benjamin.

Penhallow, Thomas W. Penhallow, by his attorney Benjamin Penhallow, and Edward Cutts.

Also a deed of the same date from the Penhallows, executed as aforesaid, of all the right to any lands situate in Canaan, belonging to the original right of Richard Wibird, with covenants of warranty against all persons claiming under Wibird.

Also a deed from Cutts of the same date, of one-sixth of seven acres of land in Canaan, in the fourth division, drawn to the original rights of Richard Wibird, and of all his title to any lands in Canaan which were transferred to him by John Lowell, jr., by virtue of a power in the will of William Cabot, with covenants of warranty against all claims under Wibird. Also a copy of the will of Cabot, empowering Lowell to convey all his real and personal estate in possession, remainder or reversion.

Also a copy of a deed from Lowell to Cutts, of one-sixth of seven acres of land in the fourth division, in Canaan, drawn to the original right of Richard Wibird, or formerly owned by him.

The defendant then offered the deposition of Oliver W. Penhallow, who testified as follows :

" I am a son of Benjamin Penhallow, late of Portsmouth, who died in the year 1839. My father, Benjamin Penhallow, was the son of John Penhallow, who died, as I think, in the year 1809. John Penhallow, my grandfather, married Sarah Wentworth, who was the daughter of Hunking Wentworth and Eliza Wentworth. Eliza was the daughter of one Richard Wibird, who died in October, 1732. Eliza had also a brother, Richard Wibird, who died in 1765, according to a genealogical table of the Wibird and Penhallow families now before me, and from having examined the inscription on the tombstone of Richard Wibird, who was an original grantee in the town of Canaan, in the county of Grafton, in this State, as I have always understood.

My father, Benjamin Penhallow, had brothers and sisters. My father and his brother, Hunking Penhallow, owned all the shares in lands that had fallen to their father, John Penhallow, by marriage with Sarah Wentworth, except the share of their brother, Thomas W. Penhallow, and their two sisters, Sarah Penhallow and Mary Austin. Sarah Penhallow died more than five years since.

Hunking Penhallow and my father afterwards conveyed their rights to William Pearce of Gloucester, in the county of Essex and State of Massachusetts, according to my impression, having heard them conversing thereon, and afterwards conveyed the same to Susan Penhallow, wife of Benjamin Penhallow.

My impression is, according to the best of my recollection, that my father was appointed attorney for his sister, Mary Austin, and Thomas W. Penhallow, nephew of my father, and son and heir of Thomas W. Penhallow, who died in 1784, who was a brother of my father.

Since the decease of my father, many of his papers, which were considered of no importance, were destroyed. Others of his papers were left in my possession, among which, after a careful examination, I do not find the powers of attorney given by Mary Austin and Thomas W. Penhallow. The other children of my father have all moved out of this State, and his wife, Susan Penhallow, has since deceased.

William Cabot, late of Cambridge, in the State of Massachusetts, was also an heir of Richard Wibird, the grantee of Canaan, as now appears by the genealogical table, which is now before me, as also from my recollection of circumstances, and from having often heard this stated as being the fact, during my father's lifetime, by him and other members of said families, and from Cabot's having acted as owner of part of Wibird's estate by inheritance."

The plaintiff objected to the admission of this deposition as incompetent, but it was admitted by the court.

Many other facts appeared in evidence upon the trial, to which it is unnecessary to allude.

A verdict was taken for the plaintiff by consent, subject to the opinion of the superior court upon the facts stated.

*Wilcox,* for the defendant.

*Kittredge,* for the plaintiff.

GILCHRIST, C. J.   The defendant's title is from Richard Wibird.   The descents are as follows:

Richard Wibird.

Eliza Wibird m. Hunking Wentworth.

Sarah Wentworth m. John Penhallow.

Their children were

Benjamin,
Hunking,
Thomas W.,
Sarah,
Mary.

Benjamin and Hunking conveyed to Pearce.
Pearce conveyed to Susan, the wife of Benjamin.
Thomas W. left a son Thomas W.
The persons entitled would then be

Susan,
Thomas W.
Sarah,
Mary.

These persons conveyed to Daniel and James Pattee, on the 19th of January, 1836, and this deed is the foundation of the defendant's title.

The question then arises, what is evidence that these grantors of the defendant had the right of Richard Wibird?

This evidence is derived entirely from the testimony of Oliver W. Penhallow. He states the various descents as they are stated above, and the relationship of the parties.

But he says that this is " according to a genealogical table of the Wibird and Penhallow families now before me, and from having examined the tombstone of the said Richard Wibird, who was an original grantee," &c.

But, in the first place, the genealogical table would be as good evidence before the jury without as with his evidence. His statement of what are the contents of the table is merely hearsay. It is the *table* which is the source of information. Therefore there should be some proof of its authenticity, by showing that it has been publicly recognized as such by the family, or that it has been prepared by some member of the family. Without this it is a mere unauthorized statement, and as such proves nothing.

A pedigree is admissible, though not hung up or made public, on proof of its having been made by a member of the family. If hung up, it is admissible without proof of its having been made by direction of the family, on the ground that it is a family acknowledgment. *Monkton* v. *Attorney General*, 2 Russel & Mylne 161. *Goodright* v. *Morse*, 2 Cow. 594.

If the pedigree be hung up publicly in a family mansion, it will be admissible without knowing who was its author. But in the absence of such publicity, it must be shown who was its author. *Ib.*

Neither requisite exists in this case.

Secondly. Inscriptions on tombstones are received as evidence of pedigree. 13 Vesey 144 ; *Whitelock* v. *Baker*, 13 Vesey 514 ; *Vowles* v. *Young*, 9 Vesey 172 ; *Doe* v. *Lybourn*, 7 T. R. 3.

Examined copies of such inscriptions are admissible for the sake of convenience. Where monuments have been decayed by time, or surreptitiously destroyed or removed, evidence of the recollections of witnesses respecting them, and

as to the inscription they bore, has been admitted by the House of Lords. 2 Phil. & Ames on Ev. 234.

But the copy of the inscription is admissible only for the sake of convenience. Here is no copy. The witness mentions the tombstone as one source of his information; but he does not state what was the inscription, nor can it be ascertained from his deposition how much of his information was derived from the tombstones, and how much from the genealogical table.

The inscription on the tombstone should have been copied, in order to be admissible, or at least the witness should be able to state what it was. Perhaps that would not have been sufficient, as the cases which admit the inscriptions have been decided on the production of copies.

Thirdly. The witness founds his statement upon the genealogical table and the inscription on the tombstone. But for the reasons before given, his testimony, so far as those are concerned, is merely hearsay.

He states that Richard Wibird was his great-great grandfather, and he is, therefore, a *consanguineus* of the family. But the descents he could not have had any personal knowledge of. And he does not say that it was reputed in the family that such were the descents. Such evidence, coming from one of the family, would be admissible. *Johnson* v. *Lawson*, 2 Bing. 86; *Ellicott* v. *Pearl*, 10 Peters 412.

Laying aside, then, the table and the tombstone, and his statement is not evidence.

The evidence of title in Susan Penhallow is imperfect.

The witness says that Hunking and Benjamin Penhallow conveyed to Pearce " according to my impression, having heard them conversing thereon, and Pearce afterwards conveyed the same to Susan Penhallow."

Such evidence is totally incompetent to prove the transfer of real estate.

The deed to the Pattees was executed on the part of

Mary and Thomas W. jr., by Benjamin Penhallow as their attorney.

To prove his authority as attorney, the witness states that " my impression is, according to the best of my recollection, my said father was appointed attorney for his sister Mary and for Thomas," and that he has looked among his father's papers and cannot find the power of attorney.

But he never saw such an instrument. He never heard the parties admit there was one. He has not searched the Registry of Deeds, where it probably would be recorded. And the facts would seem to indicate that it never existed. He has only an impression " according to his best recollection." And no evidence of any kind is attempted to be given of its contents.

The evidence is insufficient to prove the authority of Benjamin to act as attorney.

For the reasons above stated, there must be

*Judgment on the verdict.*